<u>NOT FOR PUBLICATION</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | | |
|---|---|---|
| NORABETH E. DENNIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil No. 19-18514 (RBK) |
| v. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | **OPINION** |
| | : | |
| Defendant. | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Plaintiff Norabeth E. Dennis's Appeal (Doc. No. 1) from the final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*. For the reasons set forth below, the Commissioner's decision is **VACATED** and this case is **REMANDED** for further administrative proceedings.

## I.  PROCEDURAL BACKGROUND[1]

On September 27, 2013, Plaintiff filed an application for Disability Insurance Benefits. (R. at 323). Plaintiff's application was denied on initial consideration, (R. at 212–14), and her request for reconsideration was also denied, (R. at 218–220). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 221–22). On August 29, 2016, a hearing was held before ALJ Michael Hertzig. (R. at 46–95). On September 16, 2016, ALJ Hertzig issued a decision,

---

[1] Because the record is voluminous, the Court sets forth only those facts necessary for context and relevant to the issues upon appeal. The Court cites to the administrative record as "R." Background facts and medical history are set forth in a separate section below.

finding that Plaintiff was not disabled withing the meaning of the Social Security Act. (R. at 184–201). Plaintiff appealed this decision to the Appeals Council, (R. at 457–60), and on November 29, 2017, the Appeals Council vacated ALJ Hertzig's decision and remanded for further consideration. (R. at 202–06).

Pursuant to the Appeals Council's Order, a new hearing was held before ALJ Karen Shelton on January 8, 2019. (R. at 96–156). On February 13, 2019, ALJ Shelton issued a decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 19–41). Plaintiff again appealed to the Appeals Council, but this time the Appeals Council upheld the ALJ's decision. (R. at 1–7). Consequently, ALJ Shelton's decision became the final decision of the Commissioner. Plaintiff now appeals this determination.

Plaintiff presently alleges a disability onset date of May 16, 2012. (R. at 145). Her date last insured was September 30, 2016. (R. at 371).

## II.   LEGAL STANDARD

### A.  Sequential Evaluation Process

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses an established five-step evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520.

For the first four steps of the evaluation process, the claimant has the burden of establishing his disability by a preponderance of the evidence. *Zirnsak v. Colvin*, 777 F.3d 607, 611–12 (3d Cir. 2014). First, the claimant must show that he was not engaged in "substantial gainful activity" for the relevant time period.  20 C.F.R. § 404.1572. Second, the claimant must demonstrate that

he has a "severe medically determinable physical and mental impairment" that lasted for a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. Third, either the claimant shows that his condition was one of the Commissioner's listed impairments, and is therefore disabled and entitled to benefits, or the analysis proceeds to step four. 20 C.F.R. § 404.1420(a)(4)(iii). Fourth, if the condition is not equivalent to a listed impairment, the ALJ must assess the claimant's residual functional capacity ("RFC"), and the claimant must show that he cannot perform his past work. 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404. 1520(e). If the claimant meets his burden, the burden shifts to the Commissioner for the last step. *Zirnsak*, 777 F.3d at 612. At the fifth and last step, the Commissioner must establish that other available work exists that the claimant can perform based on his RFC, age, education, and work experience. 20 C.F.R. § 404.1520 (a)(4)(v); *Zirnsak*, 777 F.3d at 612. If the claimant can make "an adjustment to other work," he is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

**B.  Review of the Commissioner's Decision**

When reviewing the Commissioner's final decision, this Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole. *Zirnsak*, 777 F.3d at 610 (citing 42 U.S.C. §405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *See*, *e.g.*, *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Courts may not set aside the Commissioner's decision if it is supported by substantial evidence, even if this Court "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

As the Court conducts its analysis, it must be wary of treating the determination of substantial evidence as a "self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). This Court must set aside the Commissioner's decision if it did not take into account the entire record or failed to resolve an evidentiary conflict.  *See Schonewolf v. Callahan*, 927 F. Supp. 277, 284-85 (D.N.J. 1997) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 110, 114). A district court's review of a final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."  *Kent*, 710 F.2d at 114.

## III.    FACTUAL BACKGROUND

### A.  Plaintiff's History

Plaintiff was born on March 26, 1977. (R. at 39). She completed high school and received training as a cardiovascular technician and as an emergency medical technician ("EMT"). (R. at 51, 106). She lives with her husband and her two adolescent sons. (R. at 51, 107). She last worked in February 2011 as a patient caregiver at a rehabilitation facility, and has prior work experience as a cardiovascular technician, emergency room technician, and nurse's aide. (R. at 51, 109, 119). Additionally, she previously served in the United States Coast Guard, enlisting in 1996 and entering the reserve in 2000. (R. at 55).

On May 16, 2012, Plaintiff was in a serious car accident. (R. at 59). She testified that she suffered a brain injury due to this car accident, and that her brain injury has caused her to suffer seizures and migraines, led to significant weakness on the right side of her body, impaired her

vision, led to memory issues, and prevented her from sleeping well. (R. at 59, 123, 129). Since the accident, Plaintiff spends most of her time at home; her driver's license is suspended due to her seizures. (R. at 61). While at home, Plaintiff mostly watches television. (R. at 66, 137). She will do laundry if someone else brings the basket downstairs for her, as she is unable to carry the basket down the stairs herself. (R. at 66). She cooks dinner for her family about twice a week. (R. at 66, 137).

Plaintiff attempts to clean her bathroom and kitchen, but is unable to perform any vigorous cleaning activities, such as scrubbing. (R. at 78). She runs errands on weekends when her father is able to drive her. (R. at 78–79). She is able to shower and get dressed on her own but finds it painful to do so. (R. at 138).

Plaintiff testified that she could experience a seizure if it is too hot or too cold, or if there are loud noises, flashing lights, or overhead lights. (R. at 69, 75). She is able to tell when a seizure is about to come on, as her head will start to hurt, and her vision will get blurry. (R. at 71). These seizures last between ten and thirty seconds. (*Id.*). In the aftermath of a seizure, Plaintiff has difficulty speaking and seeing, and her headache will grow worse. (*Id.*). In August 2016, Plaintiff was experiencing these seizures at least twice a month; she has had up to six seizures per month in the past. (*Id.*). She also experiences migraine headaches several times per month, which last one to three days each time. (R. at 73–74).

Plaintiff suffers from a sharp pain in her lower back, an ache in her hip, pain in her knees, and is unable to turn her head very far due to pain in her neck. (R. at 75, 124, 133). She testified that due to these various sources of pain, she has to get up every ten to fifteen minutes while sitting and that she frequently repositions herself. (R. at 76, 125). At her first hearing, Plaintiff testified that she could stand for about half an hour before she needs to sit down and rest, (R. at 76); at her

second hearing, Plaintiff testified that she can only stand for five or ten minutes, (R. at 124). She also indicated that she could lift no more than ten pounds. (R. at 76). Further, she experiences episodes of double or blurry vision a few times per day, with each episode lasting for up to a minute. (R. at 129, 130).

Plaintiffs maintains that she suffers from post-traumatic stress disorder ("PTSD"). (R. at 134). Plaintiff claims that her PTSD stems from her car accident and from sexual trauma she endured as a child and during her service in the Coast Guard. (R. at 134–35). Her PTSD causes her to experience severe chest pain, shortness of breath, and light-headedness whenever she goes out in public. (R. at 135–36).

### B.  Relevant Medical History

A number of medical opinions and treatment records are contained in the administrative record. Only those opinions and records relevant for the current appeal are discussed below.

#### i.  Kaniz Khan Jaffery, M.D.

Dr. Kaniz Khan Jaffery treated Plaintiff from October 2012 until February 2016. (R. at 62, 627). On January 28, 2016, Dr. Khan Jaffery completed a "Physical Residual Functional Capacity Questionnaire" for Plaintiff. (R. at 627–30). On this form, Dr. Khan Jaffery indicated that Plaintiff was diagnosed with epilepsy, with symptoms including seizures, dizziness, headaches, imbalance, facial numbness, and numbness in her extremities. (R. at 627). In response to many of the remaining questions on the form, Dr. Khan Jaffery either declined to answer, occasionally citing her lack of psychological or psychiatric expertise, or provided only vague answers. (R. at 627–630). However, Dr. Khan Jaffery did specifically indicate that Plaintiff could only carry less than ten pounds in a "competitive work situation." (R. at 629).

#### ii.  Andro Zangaladze, M.D.

Dr. Andro Zangaladze began treating Plaintiff in February 2016. (R. at 1393). On August 29, 2016, he completed a "Seizures Residual Functional Capacity Questionnaire" on Plaintiff's behalf. (R. at 1393–96). Dr. Zangaladze stated that Plaintiff had been diagnosed with "seizures," and described these seizures as "pseudoseizure (PNES), or possible focal seizures." (R. at 1393). He went on to opine that Plaintiff would be incapable of tolerating even a "low stress" job because stress can induce her seizures and indicated that Plaintiff would need to miss more than four days of work per month due to her impairments. (R. at 1396).

### iii.  Carrie Kern, D.O.

Dr. Carrier Kern began treating Plaintiff in 2013. (R. at 1680). On November 12, 2018, she submitted a letter in which she opined on Plaintiff's ability to work. (R. at 1680–81). Dr. Kern wrote:

> I have been asked to write a letter addressing whether [Plaintiff] can work 8 hour shifts, five days per week. It is my opinion that she cannot. She suffers seizures/pseudoseizures and is on Keppra. She has seizures despite therapy. She is not permitted to drive. She cannot work with machinery. She has history of brain injury following accident. She would not be able to sit at a computer for prolonged periods.

(R. at 1680). Dr. Kern then listed the various disorders with which Plaintiff had been diagnosed, including panic disorder with agoraphobia, iron deficiency anemia, vitamin D deficiency, asthma, primary fibromyalgia syndrome, mitral valve prolapse, impaired fasting glucose, folate deficiency, migraine, obesity, mass of neck, cervical disc disease, depressive disorder, and seizures. (R. at 1680–81).

### iv.  Juan Carlos Cornejo, D.O. and Samuel Sarmiento, M.D.

In preparation for her second hearing, Plaintiff underwent two consultative examinations, one with Dr. Juan Carlos Cornejo and one with Dr. Samuel Sarmiento. Dr. Cornejo examined Plaintiff on April 4, 2018. (R. at 1457). Dr. Cornejo opined that:

[Plaintiff] would have difficulty bending and turning her neck and back. She would have difficulty with prolonged walking and standing secondary to her report. She would be on height restrictions secondary to her history of seizures. She would be able to sit for a reasonable amount time [sic] with needed breaks. No significant balance limitations were observed during the evaluation. She has good use of her upper extremities for movements such as reaching. She has good functionality of her right and left hands. She would be able to handle fine and small sized objects. She has no significant limitations to fingering such as picking and pinching objections. She would be limited from physically exerting activity. However, she would be able to do sedentary activity with needed breaks, and possibly light lifting occasionally.

(R. at 1460).

Dr. Sarmiento examined Plaintiff on March 27, 2018. Dr. Sarmiento opined that:

[Plaintiff] would not be limited from walking and standing with reasonable breaks. She would be able to sit for a reasonable amount of time with needed breaks. No significant balance limitations were observed during the evaluation. She has good functionality of her right and left hands. She would be able to handle fine and small sized objects. She has no significant limitations to fingering such as picking and pinching objects.

(R. at 1476).

## C. Vocational Expert Testimony

At Plaintiff's second hearing, the vocational expert ("VE"), Robert Baker, classified Plaintiff's past employment as being a nurse assistant, a medical assistant, and a cardiac technician. (R. at 148–49). When the ALJ asked the VE if there was available work for an individual limited to sedentary work, carrying no more than ten pounds, but able to stand for at least two hours and to sit for at least six hours, the VE indicated that such an individual could find work as an addresser, a call out operator, or as a telephone quotation clerk. (R. at 150–51). Later, when Plaintiff's attorney inquired whether such an individual would still be able to find work if they were limited to occasional handling and fingering, the VE replied that there would be no work available. (R. at 153).

## D. The ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since February 1, 2011. (R. at 24). At step two, the ALJ found that Plaintiff has the following severe impairments: seizure disorder, migraine headaches, patellar maltracking disorder, and degenerative disc disease. (R. at 24). The ALJ also found that Plaintiff has several non-severe impairments: asthma, gastroesophageal reflux disease, right hip bursitis, obstructive sleep apnea, and obesity. (R. at 25).

At step three, the ALJ found that none of Plaintiff's impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listing 1.02, 1.04, and 11.02. (R. at 25–27). The ALJ explained that Plaintiff did not meet the requirements of Listing 1.02 because her patellar maltracking disorder does not interfere with her ability to perform gross and fine motor movements effectively and because Plaintiff is still able to ambulate effectively. (R. at 26). Next, the ALJ found that Plaintiff's degenerative disc disease is not of sufficient severity to meet or medically equal the criteria of Listing 1.04. (R. at 26). Finally, the ALJ concluded that Plaintiff's pseudoseizures do not amount to epilepsy as required by Listing 11.02. (R. at 26–27).

As Plaintiff did not meeting the listings requirements, the ALJ proceeded to formulate her RFC, finding that Plaintiff was able to perform:

> sedentary work as defined in 20 CFR 404.1567(a) except she had to be able to sit for 5 minutes after an hour of standing/walking; could only occasionally climb ramps [and] stairs but never climb ladders, ropes, or scaffolds; could only frequently stop, kneel, crouch or crawl and occasionally balance and frequently [sic]; could only frequently handle and finger; and could not be exposed to unprotected heights or hazardous machinery. Additionally, she could understand, remember and carry out simple instructions and make simple work decisions in a routine work environment with few changes and can work for 2 hours before needing a break.

(R. at 27).

When formulating Plaintiff's RFC, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause some of the symptoms Plaintiff testified to, but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence in the record." (R. at 28). In particular, the ALJ emphasized that Plaintiff had only received "routine and conservative" treatment and that her seizure activity was "more akin to pseudoseizures" and therefore not debilitating. (R. at 31). Overall, the ALJ asserted that "there is little objective evidence to support [Plaintiff's] complaints prior to the date last insured." (R. at 31).

In the process of reaching this conclusion, the ALJ accorded little weight to the reports of Dr. Khan Jaffery, Dr. Zangaladze, Dr. Kern, Dr. Cornejo and Dr. Sarmiento. (R. at 30–31). First, the ALJ found Dr. Khan Jaffery's opinion deficient because it fails to specify Plaintiff's functional limitations with respect to sitting, standing and waling and did not provides responses to most of the questions on the form. (R. at 30). Next, the ALJ rejected Dr. Zangaladze's opinion because it is inconsistent with his treatment of Plaintiff and because he opined on the ultimate issue of disability, which is reserved for the Commissioner. (R. at 30). Similarly, the ALJ disregarded Dr. Kern's opinion because she also opined on the ultimate issue of disability. (R. at 30). Additionally, the ALJ faulted Dr. Kern for only being a primary care provider and for failing to provide sufficient treatment notes from before the date last insured to support her opinion. (R. at 30). Finally, the ALJ found the opinions of Dr. Cornejo and Dr. Sarmiento unpersuasive because they examined Plaintiff in 2018, well after her date last insured. (R. at 31).

Based on Plaintiff's RFC, at step four the ALJ determined that Plaintiff is unable to perform her past work as a nurse assistant, medical assistant, or cardiac technician. (R. at 31–32). Nevertheless, at step five the ALJ found that there are jobs that Plaintiff can perform that exist in

significant numbers in the national economy, including addresser, call out operator, and telephone quotation clerk. (R. at 32–33). Accordingly, the ALJ concluded that Plaintiff was not disabled at any time between her alleged disability onset date and her date last insured. (R. at 33).

## IV.   DISCUSSION

On appeal, Plaintiff raises three challenges to the Commissioner's decision: (1) that the ALJ did not sufficiently explain her finding that Plaintiff did not meet or medically equal the requirements of any of the Listings of Impairments; (2) that when formulating Plaintiff's RFC, the ALJ improperly weighed the opinions of Dr. Khan Jaffery, Dr. Zangaladze, Dr. Kern, Dr. Cornejo, and Dr. Sarmiento; and (3) that the ALJ erred in her determination at step five. The Court finds that the ALJ properly found that Plaintiff did not satisfy the requirements of any of the Listings of Impairments, but that the ALJ failed to provide adequate reasons for her rejection of Dr. Zangaladze's and Dr. Kerr's opinions. Consequently, the case must be remanded for further administrative proceedings. Because the ALJ may reformulate Plaintiff's RFC on remand, the Court declines to reach Plaintiff's arguments concerning the ALJ's alleged errors at step five.

### A.  Listings of Impairments Determination

The Listings of Impairments set forth at 20 C.F.R. Pt. 404, Subpt. P, App. 1, "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and consequently require the claimant to show "a higher level of severity than the statutory standard." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (explaining that "if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits"). To qualify for this presumption, the claimant must show that his impairment meets "*all* of the specified medical criteria," as "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530.

If the ALJ finds that the claimant has not carried her burden, she must provide more reasoning for her decision than a "bare conclusory statement that an impairment did not match, or is not equivalent to, a listed impairment." *Jones v. Barnhart*, 364 F.3d 501, 504 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119–20 (3d Cir. 2000)). At the same time, the ALJ need only offer "sufficient explanation to provide meaningful review." *Jones*, 364 F.3d at 505.

As discussed above, the ALJ found that Plaintiff did not meet the requirements of any listing, and specifically considered Listings 1.02, 1.04, and 11.02. Plaintiff asserts that the ALJ provided no meaningful explanation with respect to her findings on listings 1.02, 1.04, and 11.02. (Doc. No. 10 ("Pl. Brief") at 22–24).

### i. Listing 1.02

Listing 1.02 sets forth the following criteria:

Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.

While Plaintiff suffers from joint dysfunction, as she has patellar maltracking disorder, the ALJ concluded that she did not meet the requirements of prong A of Section 1.02 because

she was still able to ambulate effectively, nor prong B because her condition did not interfere with her ability to perform fine and gross movements. (R. at 26). Plaintiff contends that the ALJ erred by not providing any further explanation as to why she concluded that Plaintiff is still able to ambulate effectively. (Pl. Brief at 22).

While the ALJ's explanation is brief, it is specific enough to permit judicial review, and is therefore adequate so long as there is substantial evidence in the record to support her finding. Under the relevant regulation, a person is able to ambulate effectively if they are "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living," while ineffective ambulation is defined as the inability to walk independently "without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 100.B.2.b. In this case, the record is replete with evidence that Plaintiff had a full range of motion and could walk with a normal gait. (R. at 525, 536–37, 687, 795, 1362, 1460, 1475). For her part, Plaintiff fails to point to any evidence that she regularly required the use of an assistive device to walk or that her ambulation was otherwise ineffective. Thus, substantial evidence supports the ALJ's determination with respect to Listing 1.02

### ii. Listing 1.04

Listing 1.04 sets forth the following criteria:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

While the ALJ acknowledged that Plaintiff has severe degenerative disc disease, she found that Plaintiff did not satisfy the additional requirements of prong A, prong B, or prong C. (R. a 26). Specifically, she explained that "a thorough review of the medical evidence fails to reveal (a) neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss; (b) spinal arachnoiditis, requiring the need to change positions/posture more than once every two hours; nor (c) an inability to ambulate effectively." (R. at 26). Plaintiff faults the ALJ's explanation for being little more than a recitation of the requirements of Listing 1.04, but she fails to point to any evidence in the record that would satisfy the listing's requirements. (Pl. Brief at 22). Because there is apparently no evidence supporting Plaintiff's position, it is unclear what more the ALJ could have done other than to recite the elements and state that they were not met. Further, there is substantial evidence in the record demonstrating that Plaintiff had normal motor function and could ambulate effectively. (R. at 525, 536–37, 687, 795, 1362, 1459–60, 1475). As such, there ALJ did not err in her assessment of Listing 1.04.

   *iii. Listing 11.02*

Listing 11.02 sets forth the following requirements:

14

Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

    1. Physical functioning (see 11.00G3a); or
    2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
    3. Interacting with others (see 11.00G3b(ii)); or
    4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    5. Adapting or managing oneself (see 11.00G3b(iv)); or

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

    1. Physical functioning (see 11.00G3a); or
    2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
    3. Interacting with others (see 11.00G3b(ii)); or
    4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    5. Adapting or managing oneself (see 11.00G3b(iv))

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.04.

Although Plaintiff suffers from seizures, the ALJ explained that these episodes are believed to be pseudoseizures, as they last less than a minute and Plaintiff does not lose consciousness. (R. at 26–27). Under the regulations, "pseudoseizures are not epileptic seizures for the purpose of 11.02." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00.H.1. Consequently, the ALJ concluded that Plaintiff failed to meet the requirements of Listing 11.02.

Once again, Plaintiff argues that the ALJ did not adequately explain her conclusion. (Pl. Brief at 22). Plaintiff is incorrect; the ALJ clearly explained that the medical evidence in the record indicates that Plaintiff suffers from pseudoseizures rather than seizures. This finding is well-supported by the record, as Plaintiff's treating physicians generally agreed that Plaintiff was suffering from pseudoseizures, including Dr. Zangaladze and Dr. Kern. (R. at 488–89, 522, 795–96, 1362, 1393, 1499, 1680). Plaintiff does not point to any contrary evidence that the ALJ failed to address. Therefore, substantial evidence supports the ALJ's conclusion with respect to Listing 11.02.

### B.  Weighing of the Medical Opinion Evidence

Plaintiff argues that the ALJ formulation of Plaintiff's RFC is not supported by substantial evidence because the ALJ failed to explain adequately her rejection of the opinions of Dr. Khan Jaffery, Dr. Zangaladze, Dr. Kern, Dr. Cornejo, and Dr. Sarmiento. Setting aside the opinions of Dr. Zangaladze and Dr. Kern for a moment, any errors concerning Dr. Khan Jaffery's, Dr. Cornejo's, and Dr. Sarmiento's opinions do not warrant remand because these opinions do not actually conflict with the RFC. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (noting that harmless error review applies to social security appeals, meaning the plaintiff must explain "*how* [she] might have prevailed . . . if the ALJ's analysis had been more thorough" (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).

As Plaintiff concedes, Dr. Khan Jaffery's report provides little of value apart from her statement that Plaintiff was limited to "carrying less than 10 lbs." (R. at 629; Pl. Brief at 25). Under the RFC crafted by the ALJ, Plaintiff was limited to sedentary work, which by definition "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket

files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Any difference between Dr. Khan Jaffery's statement in her report and the definition of sedentary work is purely semantical.

Similarly, the opinions of Dr. Cornejo and Dr. Sarmiento are generally consistent with the ALJ's formulation of the RFC. Both examiners found that Plaintiff could sit for reasonable periods of time with breaks, and that she could handle fine and small sized objects. (R. at 1460, 1476). Dr Cornejo even specifically opined that Plaintiff would be able to perform sedentary activity and possibly light lifting. (R. at 1460). For her part, Plaintiff cites to nothing specific in either report that undermines the RFC as found by the ALJ. Consequently, her objections to the ALJ's treatment of Dr. Khan Jaffery's, Dr. Cornejo's, and Dr. Sarmiento's opinions are futile.

By contrast, Dr. Zangaladze's and Dr. Kern's opinions do conflict with the ALJ's construction of the RFC, and Dr. Zangaladze and Dr. Kern were both treating physicians. In order for a treating physician's opinion to receive "controlling weight" it must be: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). But even if a treating physician's opinion is not entitled to controlling weight, it is still due substantial respect:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time . . . . The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.

*Morales*, 225 F.3d at 317 (internal quotations and citations omitted). As discussed below, the ALJ failed to provide proper reasons for her rejection of Dr. Zangaladze's opinion and Dr. Kern's opinion.

### i. Dr. Zangaladze

Dr. Zangaladze opined that Plaintiff was incapable of working even a low stress job and that she would need to miss more than four days or work per month. (R. at 1396). The ALJ rejected Dr. Zangaladze's opinion because she interpreted it as touching on the ultimate issue of disability, which is reserved for the Commissioner, and because Dr. Zangaladze's treatment notes indicate that there is no definitive diagnosis for Plaintiff's condition. (R. at 30).

Assuming *arguendo* that Dr. Zangaladze's statements do go to the ultimate issue of disability,[2] the ALJ was correct that these statements could not bind her. Nevertheless, she erred by failing to recontact Dr. Zangaladze to seek additional clarification. *See Layton v. Comm'r of Soc. Sec.*, No. 19-9120, 2020 WL 1616424, at *6–7 (D.N.J. Apr. 2, 2020) (remanding case due to ALJ's failure to seek additional clarification from a treating physician who opined on an area reserved for the Commissioner); *Murphy v. Comm'r of Soc. Sec.*, No. 19-6425, 2020 WL 1486041, at *9 (D.N.J. Mar. 26, 2020) (same); *Neitz v. Colvin*, 2015 WL 1608725, at *8 (M.D. Pa. Apr. 10, 2015) (noting that "when a treating source issues an opinion on an issue reserved to the Commissioner, the ALJ is generally obligated to recontact the treating physician"). The applicable regulation states:

> [O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

SSR 96–5p.[3]

---

[2] Plaintiff argues that Dr. Zangaladze was merely commenting her ability to function, rather than determining that she was disabled. (Pl. Brief at 26).

[3] SSR 96–5p has been rescinded, but remains in effect for claims, such as this one, filed before March 27, 2017. Rescission of Social Security Rulings 96–2p, 96–5p, and 6–3p, 82 Fed. Reg. 15,263 (Mar. 27, 2017).

Subsequently enacted regulations have modified SSR 96–5p, such that "recontacting a medical source is now discretionary" rather than mandatory. *Bryson v. Comm'r of Soc. Sec.*, 639 F. App'x 784, 787 n.8 (3d Cir. 2016) (citing 20 C.F.R. § 404.1520b(c)–(d)).[4] Consequently, an ALJ may forgo recontacting the treating source if there is some other valid reason for rejecting the opinion in question. *See Vargas v. Berryhill*, No. 16-2003, 2018 WL 1938312, at *7 (M.D. Pa. Mar. 13, 2018) (finding recontact unnecessary where ALJ found other medical evidence contradicted physician's opinion), *report and recommendation adopted by* 2018 WL 1932879 (M.D. Pa. Apr. 24, 2018).

The ALJ did not  make any effort to recontact Dr. Zangaladze, nor did she provide any valid reasons for rejecting Dr. Zangaladze's opinion. Although Dr. Zangaladze's inability to definitively diagnose Plaintiff does not support his statements on her ability to work, it also does not undermine these statements. Rather, the lack of a definitive diagnosis in Dr. Zangaladze's treatment notes simply underscores that the bases for his opinion were unclear, meaning that the ALJ was obliged to seek further clarification from him.[5]

    ii.  *Dr. Kern*

Dr. Kern opined that Plaintiff would not be able to work eight-hour shifts, five days per week, citing Plaintiff's "seizures/pseudoseizures." (R. at 1680). The ALJ gave little weight to Dr.

---

[4] SSR 96–5p's mandatory language parallels that of an earlier regulation, 20 C.F.R. § 404.1512(e), which was eliminated effective March 26, 2012. *Ross v. Colvin*, No. 15-0990, 2015 WL 1636132, at *9 n.4 (M.D. Pa. April 8, 2015).

[5] In his brief, the Commissioner argues that other portions of Dr. Zangaladze's treatment notes document findings that clearly contradict Dr. Zangaladze's opinions on Plaintiff's ability to work. (Doc. No. 11 ("Com. Brief") at 24). However, the ALJ did not discuss these portions of the treatment notes when rejecting Dr. Zangaladze's opinion, and thus the Court cannot affirm her decision on this basis. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908 (2020) (noting that "[i]t is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action"); *Fargnoli*, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (vacating opinion of district court that, "apparently recognizing the ALJ's failure to consider all of the relevant and probative evidence, attempted to rectify this error by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ").

Kern's opinion because: (1) Dr. Kern had opined on an area reserved for the Commissioner; (2) Dr. Kern provided few treatment notes from before the date last insured; and (3) Dr. Kern was a primary care provider, rather than a specialist. (R. at 30). As discussed above, while the ALJ could not be bound by Dr. Kern's opinion on an area reserved for the Commissioner, she needed to either seek additional clarification from Dr. Kern or to provide valid reasons why the opinion could be rejected without further clarification. The absence of treatment notes is not a valid reason for declining to recontact a treating physician. *See Layton*, 2020 WL 1616424, at *7 (explaining in a similar case that "[t]he Commissioner's position is effectively that the ALJ did not need to seek more information from [a treating physician] because she was missing information from [the treating physician]—a proposition that would gut SSR 96–5p of all meaning").

Consequently, the ALJ's decision holds up only if she could permissibly disregard the opinion of a treating physician simply because that physician was a non-specialist. She could not. Under the regulations, an ALJ may give more weight to the opinion of a specialist related to her area of specialty than to the opinion of a non-specialist. 20 C.F.R. 404.1527(c)(5); *see, e.g., Cunningham v. Comm'r Soc. Sec.*, 607 F. App'x 111, 119 (3d Cir. 2012) (affirming ALJ's rejection of psychologist's opinion the effect of claimant's migraines on her ability to work); *Layton*, 2020 WL 1616424, at *6 (affirming ALJ's rejection of psychiatrist's opinion on claimant's physical limitations). But at the same time, courts have recognized that physicians, including primary care providers, may permissibly opine on areas they do not specialize in so long as they have actually provided relevant treatment to the claimant. *See Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) (holding that treating chronic pain specialist could opine on claimant's mental health because he provided treatment for claimant's psychiatric impairment (citing *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (holding that primary care physicians can offer opinions on their

patients' mental health))); *Cramer v. Colvin*, No. 13-2665, 2014 WL 6982672, at *10 (M.D. Pa. Dec. 10, 2014) (holding primary care provider could opine on claimant's mental health because he prescribed medication for claimant's mental health impairments); *Heinze v. Heckler*, 581 F. Supp. 13, 14 (E.D. Pa. 1983) (noting that "[s]pecialization is not a prerequisite to qualification as an expert medical witness). Indeed, because primary care physicians often lack a well-defined specialty, holding otherwise would perversely except them from the "cardinal principle" that the opinions of treating physicians should be accorded "great weight." *See Lester*, 81 F.3d at 833 (stressing that "[t]he treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations").

In this case, the record shows that Dr. Kern provided treatment to Plaintiff for her seizures. (R. at 1685–86). Thus, Dr. Kern permissibly opined how Plaintiff's seizures would affect her ability to work. While the ALJ could have given Dr. Kern's opinion less weight than that of a neurologist or other specialist, she was not entitled to reject it entirely, nor to forgo recontact. Therefore, remand is warranted.

## V.   CONCLUSION

For the reasons set forth above, the Commissioner's decision is **VACATED** and this case is **REMANDED** for further administrative proceedings consistent with this opinion. An Order follows.

Dated: July 15, 2020                               /s/ Robert B. Kugler
                                                              ROBERT B. KUGLER
                                                              United States District Judge